# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **SHARON THOMAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 1:06cv0077 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J.

Astrue, the Commissioner of Social Security ("Commissioner"), denying the application of

Sharon Thomas for supplemental security income benefits ("SSI") under Title XVI of the

Social Security Act ("the Act") the Act, 42 U.S.C. §§ 1381-1383b, is before the Court, see

28 U.S.C. § 636(c), for a final disposition.  Ms. Thomas has filed a brief in support of her

complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Prior to the application at issue, Sharon Thomas ("Plaintiff") applied three times for

SSI and was denied three times.  After filing the application at issue, she applied again in

2005; this application was denied.  She filed the application at issue in May 2003, alleging

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security after this action was filed and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

a disability onset date of October 1, 2002, caused by back problems, carpal tunnel syndrome, headaches, left shoulder pain, and knee pain. This application was denied initially and after a hearing before an Administrative Law Judge ("ALJ").[2] (R.[3] at 58, 64-68, 90-98.) The Appeals Council remanded for the ALJ to (i) obtain additional evidence about Plaintiff's back condition and carpal tunnel syndrome; (ii) further evaluate her subjective complaints; (iii) give further consideration to her residual functional capacity; and (iv) if necessary, obtain testimony by a vocational expert. (Id. at 111.) Following another hearing in February 2006 before ALJ James K. Steitz, her application was again denied. (Id. at 20-36, 50-57.) The Appeals Council denied review, effectively adopting the decision of the ALJ as the Commissioner's final decision.

## Testimony Before the ALJ

Plaintiff, represented by counsel, testified at the brief administrative hearing.

Answering questions asked by her attorney, Plaintiff testified she was born on September 29, 1968, and was then 37 years' old. (Id. at 51.) She was 5 feet 4 inches tall and weighed 162 to 169 pounds. (Id.) She had finished the ninth grade, and had never obtained a General Equivalency Degree ("GED"). (Id.) She could read and write. (Id.) She lived with her three children, the youngest of whom was thirteen years' old. (Id. at 50.)

---

[2]The transcript of this hearing is not in the record filed by the Commissioner.

[3]References to "R." are to the administrative record filed by the Commissioner with his answer.

Asked what problems prevented her from working, Plaintiff listed her neck pain, stiffness, soreness, carpal tunnel syndrome in both wrists, lower back problems, leg braces, and arm braces. (Id. at 52.) She had had surgery on her neck, but there was no improvement. (Id. at 53.) The surgeon had referred her to a pain clinic. (Id.) She had had surgery on her right wrist, but it had not helped. (Id.) She took pain medication, but it did not help. (Id. at 54.) It also did not increase her ability to walk, stand, or sit. (Id.) She could not perform a job requiring her to be on her feet for five or six hours a day. (Id.) Her back and knees hurt when she stood or walked. (Id.) During the day, she was on her feet for a total of three or four hours, but could stand for only thirty minutes at a time. (Id.) If she had to sit for too long, her body got numb. (Id. at 55.) And, if she had a job requiring the use of her hands to grip or grasp for two or three hours a day, it would aggravate the pain in her neck and hands. (Id.) Because of this pain, she did not perform such household tasks as peeling potatoes. (Id.) Her older daughter helped with the other children. (Id.)

On an average day, she got up and got something to eat or watched television. (Id.) She lay down most of the time. (Id.) Her doctor told her not to bend, lift, or twist. (Id. at 56.) If she did too much, her pain became worse. (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and an evaluation report.

Plaintiff completed a Disability Report, listing October 8, 2002, as the date when her impairments first bothered her and stopped her from working. (<u>Id.</u> at 126.) She had not worked since that date. (<u>Id.</u>) She last worked on October 2, 2002, when her doctor told her to stop working. (<u>Id.</u>) The longest job she had held was doing housekeeping for a hotel from 1991 to 1999. (<u>Id.</u>) She had worked in a factory from July 2002 to October 2002. (<u>Id.</u>) She had consulted Judith Haggard from 2001 to May 12, 2003; the Pemiscot Memorial Health Systems from January 2003 to March 2003; and the Twin Rivers Regional Medical Center in 2003. (<u>Id.</u> at 128-29.)

On a separate, claimant questionnaire, completed on Plaintiff's behalf by an aunt, it was reported that Plaintiff had bad headaches, shortness of breath, knees that buckled, and pain in her legs, back, and left shoulder. (<u>Id.</u> at 145.) She had difficulty sleeping, even when she took medication. (<u>Id.</u>) At times, she could stand for no longer than five or ten minutes. (<u>Id.</u>) If she sat for too long, her back hurt. (<u>Id.</u>) Her headaches, shoulder pain, and knee pain were caused by the three protruding disks in her back. (<u>Id.</u>) Her back pain was caused by sitting or laying in one place too long. (<u>Id.</u>) These symptoms happened every day, all day. (<u>Id.</u>) Nothing, including medication, relieved the pain. (<u>Id.</u>) Because of her symptoms, she could not work, clean her house, wash her clothes, or sleep. (<u>Id.</u>) She had trouble bathing and depended on her children to take of everything. (<u>Id.</u> at 146.) She had trouble staying asleep because she got short of breath. (<u>Id.</u>) Her family prepared her meals because she could not lift any pans or stand for long, and the heat from the stove caused her headaches. (<u>Id.</u>) Her family also did her shopping for her. (<u>Id.</u>) She could not follow

directions and easily forgot things.  (Id.)  She did not do any activities and watched only cartoons on television because they were the only thing that made sense to her.  (Id. at 147.) Reading made her head hurt.  (Id.)  Although she had a driver's license, she did not drive because she could not focus.  (Id.)  She left the house only for a very short time because of the pain in her legs and back.  (Id.)  Also, Plaintiff's mood swings prevented her from being around people or making friends.  (Id. at 148.)  Plaintiff noted that she needed therapy, but had no transportation.  (Id.)

On another questionnaire, Plaintiff reported in August 2004 that she taking Ultracet, but it made her drowsy.  (Id. at 155.)  She had not reported this to a doctor because she had been taking it for only one week.  (Id.)  Her doctor had told her to stop smoking; she had not. (Id. at 157.)  After she stopped work in October 2002, public assistance provided for her food, clothing, and housing.  (Id. at 154.)  Her impairments, i.e., the pain in her arms and neck and her shoulder injury at work, prevented her from occasionally or frequently lifting ten pounds or more and from standing or walking for approximately six hours in an eight-hour work day.  (Id. at 157.)  Her impairments also limited her ability to push or pull.  (Id.)

Plaintiff listed four jobs on a work background form.  (Id. at 152.)  She worked as a housekeeper for two hotels in 1992 and 1993.  (Id.)  From 1998 to 2002, she worked for a temporary agency doing factory jobs.  (Id.)  She worked at a specific factory from July 2002 to October 2002.  (Id.)

After the initial denial of her application, Plaintiff completed another disability report, stating that her impairments had gotten worse since she last completed a report.  (Id. at 161.)

Specifically, her pain was worse, she had been told that no further operations would be helpful, and she had been referred to pain management. (Id.) Her husband, who lived at a different address, could provide information about her impairments. (Id.)

Plaintiff had earned income in twelve of the eighteen years between 1988 and 2005, inclusive. (Id. at 123.) Her highest income was $4,290.02, in 2002. (Id.) Her next highest was $3,283.55, in 1999. (Id.) In only three of the remaining years of earned income, did Plaintiff earn more than $1,000 annually. (Id.)

The medical records[4] before the ALJ begin in 2001.

Plaintiff had a well-woman exam on October 26, 2001. (Id. at 185.) She cancelled her next appointment. (Id.) The next month, she requested that her knees be x-rayed. (Id. at 184.) She was told before that she needed pins in her knees, but had not had any surgery on them. (Id.)

On April 2, 2002, the morning after being struck in the head with a bottle during a fight, Plaintiff went to the emergency room at Twin Rivers Regional Medical Center ("Twin Rivers") with complaints of headaches, a swollen face, and joint pain. (Id. at 202-04.) Her vision had been blurry the night before, but was no longer. (Id. at 202.) She denied loss of consciousness. (Id. at 204.) A computed tomography ("CT") scan of her head was normal. (Id. at 214.) A CT scan of her face revealed an apparent septal deviation, but no cuts, fractures, or deformities in her facial bones. (Id.)

---

[4]The medical records that reflect complaints or conditions that are not relevant to the impairments at issue, e.g., menstrual problems or cold symptoms, will not be discussed.

Plaintiff returned to the emergency room on May 22, complaining of abdominal, left arm, left shoulder, and low back pain after she was involved in a one-car accident. (Id. at 198-99.) Blood tests showed that she was intoxicated and had abnormal white and red blood cell counts. (Id. at 221.) Her medical history was significant for asthma. (Id. at 199.) X-rays of her left shoulder, left elbow, and lumbar spine revealed no signs of fracture or subluxation. (Id. at 211.) A CT scan of her abdomen and pelvis showed no significant abnormalities with the exception of a bladder partially displaced by a deviated uterus. (Id. at 210, 212.)

Five days later, Plaintiff again went to the emergency room, complaining of chest pain after she hit the steering wheel when in a motor vehicle accident. (Id. at 196-97.) An x-ray of her chest was negative. (Id. at 208.) Blood tests showed an abnormal white blood cell count and a normal red blood cell count. (Id. at 218.) She was prescribed Percocet, a narcotic pain reliever. (Id. at 197.)

Plaintiff consulted Judith Haggard, a family nurse practitioner, on June 3 about a breathing problem she had had since a motor vehicle accident two weeks before. (Id. at 183.) She had been x-rayed and had had tests done, but no injuries had been found. (Id.) She reported that she frequently had bronchitis, her chest was hurting, and she had a cough. (Id.) She smoked 12 to 15 cigarettes.[5] (Id.) A chest x-ray taken the next day revealed linear

_____

[5]The record does not specify the time period during which this number of cigarettes are smoked.

atelectasis[6] in the base of the right lung and no active pulmonary disease. (<u>Id.</u> at 207.) Plaintiff did not keep her next two appointments. (<u>Id.</u> at 183.)

On examination at Plaintiffs next, June 11, visit to Ms. Haggard, her lung sounds were clear with the exception of diminished breath sounds in the right base. (<u>Id.</u> at 181-82.) There was no apparent shortness of breath. (<u>Id.</u> at 181.) Ms. Haggard consulted with Dr. Granada,[7] who prescribed antibiotics. (<u>Id.</u>) Plaintiff was to return in two weeks for another x-ray. (<u>Id.</u>)

Plaintiff returned to the emergency room on October 6 after she was in a motor vehicle accident. (<u>Id.</u> at 190-91.) She had headaches and lower abdominal pain. (<u>Id.</u> at 190.) She had no chest or neck pain. (<u>Id.</u>) An x-ray of her cervical spine "showed a slight reversal of the normal cervical lordosis, suggestive of muscle spasms" and was otherwise unremarkable. (<u>Id.</u> at 206.) An x-ray of her pelvis was without significant abnormality. (<u>Id.</u>) Two days later, Plaintiff consulted Ms. Haggard about the effects of the accident. (<u>Id.</u> at 180.) She had a full range of motion in her neck; no spasms were noted. (<u>Id.</u>) She was taking a muscle relaxer and ibuprofen. (<u>Id.</u>) She was to continue her medications and to apply ice to her neck and shoulders. (<u>Id.</u>)

On October 22, Plaintiff went to the emergency room, complaining of numbness and pain in her right hand and right shoulder. (<u>Id.</u> at 188-89.) Her respiration was even. (<u>Id.</u> at

---

[6]Atelectasis is the "[a]bsence of gas from a part or the whole of the lungs, due to failure of expansion or resorption of gas from the alveoli." <u>Stedman's Medical Dictionary</u>, 161-62 (26th ed. 1995) (alteration added).

[7]Ms. Haggard worked with Gustavo Granada, M.D.

189.) Ms. Haggard saw Plaintiff the next day and scheduled her for an appointment to see a Dr. Chaudhary for nerve studies. (Id.)

Ms. Haggard noted on December 3 that an electromyogram ("EMG") had revealed carpal tunnel syndrome and that a magnetic resonance imaging ("MRI"), see id. at 205, had revealed bulging discs at C3-4 and C4-5. (Id. at 177.) The diagnosis was carpal tunnel syndrome, knee pain, and bulging discs. (Id.) Plaintiff was to be referred to "Back Care." (Id.) Plaintiff cancelled the next two appointments. (Id.)

Plaintiff consulted Ms. Haggard on January 7, 2003, about back and wrist pain. (Id. at 176.) She was to wear wrist braces. (Id.) She did not keep her next two appointments. (Id.)

Dr. Granada referred Plaintiff to Pemiscot Memorial Health Systems ("Pemiscot") for physical therapy on January 30. (Id. at 230.) At her initial evaluation, Plaintiff explained that she had been in a car accident in April 2002, and had had neck pain since October 2002. (Id.) She described the neck pain as a nagging pain at times and a dull, aching pain at other times. (Id.) After the initial evaluation, Plaintiff cancelled the next session due to a death in her family. (Id. at 227.) She did participate in physical therapy sessions on February 4, 6, 10, and 11. (Id.) On February 6, she stated that her pain was a three out of ten, with ten being the worst. (Id.) At the February 11 session, she reported that her neck did not hurt as often as it had in the past. (Id. at 226.) Her pain was a three. (Id.) Plaintiff did not appear for her next three sessions and was discharged from physical therapy on February 20 because of the consecutive "no-shows." (Id.)

On May 12, Plaintiff reported to Ms. Haggard that she had not finished physical therapy; she wanted medication.  (Id. at 175.)  She was having trouble breathing at night.  (Id.)  On May 20, Plaintiff complained of left shoulder and chest pain following a motor vehicle accident.  (Id. at 174.)  She had had to stop physical therapy because of a lack of transportation and wanted a referral to a local therapist.  (Id.)  She had a decreased range of motion in her neck and was holding her left shoulder asymmetrically.  (Id.)  She was referred to Dr. Landry for her shoulder pain.  (Id.)  One week later, Plaintiff complained of headaches that caused neck pain.  (Id. at 173.)  She was able to rotate her neck to 60 degrees on each side.  (Id.)  The diagnosis was cervical disc bulges, shoulder pain, and headaches.  (Id.)  She was prescribed Flexeril, a muscle relaxant, continued on Celebrex, and instructed to continue physical therapy.  (Id.)  Her weight was 177 pounds.  (Id.)

On June 5, Plaintiff consulted Dr. Edmund Landry for complaints of pain in the left side of her neck, headaches, and blurred vision.  (Id. at 234.)  She did not have any low back pain.  (Id.)  Dr. Landry referred Plaintiff to the Brain and NeuroSpine Clinic ("BNC"), where she was evaluated on June 24 by Christine Byrd, R.N., A.N.P.  (Id. at 236-39, 304-07.)  Plaintiff informed Ms. Byrd that, in addition to the April 2002 accident, she had again injured her neck in July 2002 when lifting at work.  (Id. at 236.)  She described her current impairments as frontal and occipital headaches; left-sided neck pain radiating into her left upper chest region, left suprascapular region, and left deltoid region; pain in her hands; carpal tunnel syndrome; occasional blurred vision; occasional numbness and tingling n her feet; and diffuse aches in her neck, back, arms, legs, and knees during cold weather.  (Id.)

Her pain was a six out of ten.  (Id. at 237.)  She reported that three months of physical therapy had not significantly improved her symptoms.  (Id. at 236.)  Her medications included Darvocet, Flexeril, and Celebrex.  (Id.)  She smoked one pack of cigarettes a day, and had done so for sixteen years.  (Id. at 237.)  She drank alcohol, but did not indicate how much.  (Id.)  She seemed comfortable at rest.  (Id.)  She was alert and oriented to person, place, time, and event.  (Id.)  Her insight, judgment, mood, affect, intellectual functioning, attention span, and concentration seemed normal.  (Id.)  She had no apparent deficiencies in her fund of knowledge.  (Id.)  In her neck, she had a 10% range of motion in flexion and a 50 to 75% range of motion in extension.  (Id. at 238.)  She had a 50% range of motion in left rotation, a 25 to 50% range in right rotation, and a 25 to 50% range of motion in right and left lateral bending.  (Id.)  Her Spurling's sign produced some increased neck pain,[8] but no radicular pain.  (Id.)  She had a "somewhat stiff gait."  (Id.)  The diagnostic impression was (1) of neck and left shoulder/deltoid pain that apparently followed a C4 and C5 dermatomal pattern, but no evidence of radiculopathy or myelopathy, and (2) carpal tunnel syndrome by history.  (Id.)  Plaintiff was encouraged to stop smoking.  (Id.)

Plaintiff returned to the emergency room at Twin Rivers on October 26 with complaints of headaches.  (Id. at 352-55.)  The diagnosis was cephalgia.[9]  (Id. at 353.)  Two months later, Plaintiff went to the emergency room with complaints of neck pain, chest pain,

---

[8]"Spurling's sign is performed by the patient extending her neck and rotating her head toward the side of [her] pain.  The test is positive if pain is exacerbated by this position."  Medscape Today, http://www.medscape.com/view/article/408540-4 (last visited Sept. 20, 2007).

[9]Cephalalgia is defined as a headache.  Stedman's Medical Dictionary at 310.

headaches, and a stuffy head, the last being of one day's duration.  (Id. at 348-51.)  The diagnoses were sinusitis, bronchitis, urinary tract infection, and cervical spasm.  (Id. at 349.)  Plaintiff returned on December 23 with complaints of back and knee pain; the diagnosis was arthritis.  (Id. at 344-47.)

On June 15, 2004, Plaintiff went to the emergency room with complaints of abdominal pain, but left within two hours without being treated.  (Id. at 340-43.)  In September, she reported that she had an elbow injury following a motor vehicle accident.  (Id. at 333-39.)  Her pain was a five on a ten-point scale.  (Id. at 335.)

Plaintiff consulted Kevin A. Vaught, M.D., with the BNC on October 6.  (Id. at 298-300, 302.)  She reported that she had stopped physical therapy because of a lack of transportation and that it had made her neck pain worse.  (Id. at 298.)  She had numbness, swelling, and pain in her hands and upper forearms.  (Id.)  For the past six months, her legs had felt heavy.  (Id.)  She had back pain, some bilateral tingling in her legs, blurred vision, and headaches.  (Id.)  She was to be scheduled for a repeat EMG and nerve conduction study ("NCV") of her upper extremities, an MRI of her cervical spine, and an MRI of her brain.  (Id. at 299.)

The same day, she went to the emergency room.  (Id. at 324-32.)  It was noted that she was performing her activities of daily living independently and that she appeared to be "normally interacting and happy and smiling."  (Id. at 330.)  She rated her back pain as a six on a ten-point scale.  (Id.)  On discharge, within an hour of admission, her pain was a four.  (Id.)  She was prescribed Percocet.  (Id. at 333.)

Two weeks later, Plaintiff had the studies recommended by Dr. Vaught.  (Id. at 380-99.)  The MRI of her cervical spine showed a reversal of the normal cervical lordosis; tiny central disk protrusion and annular tear at C2-3; moderate central stenosis at C3-4, secondary to diffuse annular bulge; moderate to severe central stenosis at C4-5; mild to moderate central stenosis at C5-6, secondary to a diffuse annular bugle; minimal bilateral neuroforaminal narrowing at C5-6; and minimal disk bulge at C6-7, with no stenosis.  (Id. at 381-82.)  The MRI of her brain showed no intracranial abnormality and a trace of left ethmoid sinus disease.  (Id. at 383-84.)  The EMG and NCV showed bilateral carpal tunnel syndrome and left C5-6 radiculopathy.  (Id. at 385-86, 398-99.)

Four days after the tests, Plaintiff returned to BNC, reporting that her headaches were worse than at the last visit and were in the frontal region behind her eyes.  (Id. at 293-95, 297.)  Selective motor testing revealed 5/5 strength in all major muscle groups and a normal and symmetrical muscle bulk and tone.  (Id. at 294.)  It was noted that the MRI of her cervical spine had revealed spondylosis at C3-4 and moderate spondylosis at C4-5 and C5-6.  (Id. at 294.)  Dr. Vaught recommended bilateral endoscopic carpal tunnel release, with the right being performed first, and a C4-5 and C5-6 anterior cervical discectomy and fusion.  (Id. at 295.)  Plaintiff agreed.  (Id.)

Plaintiff had an MRI of her lumbar spine on October 31.  (Id. at 375-79.)  The impression was of a "very subtle increased signal on the T1 weighted and T2 weighted sequences in the regions immediately adjacent to the superior endplates of L1 and L2."  (Id. at 379.)  A chest x-ray on November 8 was normal.  (Id. at 368-74.)

- 13 -

On November 10, Plaintiff returned to BNC to discuss the results of the lumbar spine MRI.  (Id. at 289-92.)  It was noted that the MRI was "essentially normal."  (Id. at 290.)  She was scheduled for carpal tunnel release the next day.  (Id. at 289.)  She reported some low back pain and intermittent numbness in both legs.  (Id.)  Even with wrist splints, she woke up with wrist pain at night.  (Id.)  Her straight leg raising and Patrick's test[10] were negative.  (Id.)  An examination did not reveal any evidence of lumbar radiculopathy or myelopathy.  (Id. at 290.)  The next day, Dr. Vaught performed the right endoscopic carpal tunnel release surgery.  (Id. at 364-67.)

Two weeks later, Plaintiff returned to BNC for a follow-up visit for that surgery.  (Id. at 286-88.)  She did not have the pain or paresthesia in the right hand that she had had before the surgery.  (Id. at 286.)  She reported that she had been diagnosed with carpal tunnel syndrome in the left wrist.  (Id.)  On examination, she had 5/5 strength in all the muscle groups, and symmetrical muscle bulk and tone.  (Id.)  She also had symmetrical and normal sensation in her upper extremities.  (Id.)  Her gait was normal.  (Id.)

In January 2005, Paul J. Guidos, M.D., with Southeast Missouri Hospital, evaluated Plaintiff's complaints of bilateral wrist pain radiating up to her forearms.  (Id. at 362-63.)  Plaintiff also reported some neck pain, and, of two years' duration, headaches and blurred vision.  (Id. at 362.)  On examination, she was in no acute distress and had no significant signs of muscle atrophy.  (Id.)  Her pain was consistent with carpal tunnel syndrome and

---

[10]A positive Patrick's test is suggestive of sacroiliitis.  Family Practice Notebook, Patrick's Test, http://www.fpnotebook.com/RHE37.htm (last visited Sept. 25, 2007).

there were no signs of acute denervation.  (Id. at 362-63.)  There was definite improvement from her previous study.  (Id. at 363.)  She had left C5-6 radiculopathy.  (Id.)  Five days later, she had an EMG of her right upper extremities.  (Id. at 361.)

The next day, she went to the St. Francis Medical Center for an anterior cervical discectomy and fusion for the cervical spondylosis at C4-5 and C5-6.  (Id. at 255-76, 283-85.)  On discharge two days later, she was to wear a cervical collar.  (Id. at 255.)  Her condition was described as "good."  (Id.)  She was walking without help and her pain was "well controlled."  (Id.)

In March, Plaintiff went to the Twin Rivers emergency room with complaints of pain.  (Id. at 317-23.)  The pain was attributed to a viral syndrome.  (Id.)

Plaintiff reported to Ms. Haggard the next month that she was depressed and had been in a First Step Unit for attempted suicide.  (Id. at 412.)  She had been prescribed medication by a Dr. Lorenzo – she could not recall the name of the medication – and also had been having chronic pain as a result of a motor vehicle accident several years before.  (Id.)  Her answers on a depression index were "very strong for depression."  (Id.)  She was prescribed Cymbalta, an anti-depressant.  (Id.)  Four days later, Plaintiff consulted Abdul Naushad, M.D., with the Poplar Bluff Regional Medical Center for complaints of low back pain and neck pain.  (Id. at 278, 309, 435, 436.)  She was not tender in either area.  (Id. 278, 435.)  The low back pain was a throbbing pain that came and went; the neck pain was constant and throbbing.  (Id. at 309, 406.)  Her range of motion in her right shoulder and right knee was

not limited.  (Id.)  She was prescribed Naprosyn, Darvocet, and Neurontin, and told to return in two weeks.  (Id. at 278, 435.)

Plaintiff saw Ms. Haggard on May 3 for her continuing knee and chronic back pain. (Id. at 411.)  Her neck hurt from a motor vehicle accident and her back hurt.  (Id.)  The arthritis panel was negative.  (Id.)  She walked with a normal gait and normal internal and external rotation.  (Id.)

On May 11, Plaintiff went to Dr. Vaught with the BNC for a neurological evaluation, reporting improvement in her neck pain, but persistent upper extremity and low back pain. (Id. at 280-82.)  She denied lower extremity weakness.  (Id. at 280.)  She was wearing a splint on her right wrist and complaining of nocturnal parestheisa in her right hand.  (Id.) Medications prescribed by Dr. Naushad had not alleviated the pain.  (Id.)  On examination, she had 5/5 strength in all major muscle groups except for 4/5 strength in her right biceps and triceps.  (Id. at 281.)  Her muscle bulk and tone were symmetrical and normal.  (Id.)  Her gait was normal.  (Id.)  "Dermatomal challenges to light touch revealed normal and symmetrical sensation in the upper and lower extremities except [for] some hypesthesia along her right anterior forearm and the palm of her right hand."  (Id.)  Dr. Vaught was unable to identify a specific dermatomal pattern for her pain.

The next day, Plaintiff reported to Dr. Naushad that the pain in her low back was throbbing, sharp, and intermittent.  (Id. at 308, 434.)  Her neck pain continued to be constant and throbbing.  (Id.)  Darvcet was not helping, and was to be discontinued.  (Id. at 433.)  She

was to have a CT scan of her neck, which she did five days later.  (Id. at 277, 433.)  The earlier surgery appeared to be satisfactory; no other abnormality was identified.  (Id. at 277.)

The same day, May 17, Plaintiff consulted Ms. Haggard for bilateral knee pain.  (Id. at 410.)  They discussed a referral to Dr. Landry.  (Id.)  Plaintiff reported that Vicodin helped more than Lorcet.  (Id.)  Ms. Haggard noted that Plaintiff held her neck stiff.  (Id.)  Ten days later, Plaintiff asked Ms. Haggard for a brace for her right knee for instability.  (Id. at 409.)  The knee "look[ed] a little bit swollen."  (Id.)

On May 31, Plaintiff had an x-ray of her lumbar spine.  (Id. at 408.)  It revealed mild diffuse osteoarthritis degenerative disc disease and mild appearance compression deformity of the right side of the superior end plate at T12.  (Id.)  Muscle strength was appropriate and equal bilaterally; she had a full range of motion.  (Id.)  An MRI of her lumbar spine showed an L3-4 diffuse disc bulge extending into lateral recesses and causing left greater than right mild foraminal stenosis; T11-12 disc dessication and mild disc bulge causing central canal stenosis; superior endplate T12, probable Schmorl's node; and probable old superior endplate compression deformity of T12 vertebral body.  (Id. at 313.)

Plaintiff returned to Dr. Naushad on July 11 for complaints of low back pain and a "history of" left knee pain.  (Id. at 431-32.)

Three days later, she consulted Dr. Granada about right wrist pain.  (Id. at 310.)  He recommended she consult the surgeon who had performed the carpal tunnel release surgery and he increased her dosage of Neurontin.  (Id.)

On August 11, Dr. Naushad renewed Plaintiff's pain medications.  (Id. at 429-30.)

- 17 -

Two weeks later, Plaintiff consulted Ms. Haggard.  (Id. at 356-57, 401.)  The diagnosis was anemia.  (Id. at 401.)  And, she was to have an arthritis panel to determine the cause for her musculoskeletal pains.  (Id.)

Dr. Naushad renewed Plaintiff's pain medications again in September.  (Id. at 427.)  He told her to stop smoking.  (Id.)

Plaintiff consulted Scott Miskelly, F.N.P., with the Doctors Inn Clinics, on September 25.  (Id. at 416.)  The diagnosis was morbid obesity.  (Id.)  Plaintiff wanted to start a diet program.  (Id. at 417-18.)  She reported no other problems.  (Id. at 417.)  She was instructed on diet and exercise and told to stop drinking sodas.  (Id.)

On October 10, Dr. Naushad discontinued Plaintiff's prescription for Lorcet.  (Id. at 426.)

Two weeks later, Plaintiff consulted David Diffine, M.D., with the Doctors Inn Clinics.  (Id. at 415.)  She had been given diet pills, but wanted to talk about her depression.  (Id.)  She was drinking three beers a night and had problems with her three children and boyfriend.  (Id.)  She had been taking Percocet.  (Id.)  Dr. Diffine encouraged her to go to an emergency room if she was suicidal; she refused.  (Id.)  They discussed having the children's father take them for awhile so she would have time to herself.  (Id.)  Two days later, Plaintiff wanted to start a diet program and wanted medication for depression.  (Id. at 414.)

On November 2, Plaintiff told Dr. Diffine that she was sleeping about three hours a night. (Id. at 413, 420.) He diagnosed her with major depression, recurrent episode, severe. (Id.)

The next week, Plaintiff consulted Dr. Naushad about the low back pain that radiated to the left side of her knee. (Id. at 423-24.) Her legs were numb; her arms ached. (Id.) Percocet helped. (Id.)

The Cymbalta, however, did not help. (Id. at 419.) Plaintiff told Dr. Diffine this on November 21. (Id.) She was accompanied by police officers to this visit because she was then incarcerated after trying to shoot her boyfriend. (Id.) She admitted that she had tried to run down a police officer in the past. (Id.) She had a felony conviction and a gun. (Id.)

On December 6, Plaintiff told Dr. Diffine that her children had been removed from her custody and were in the care of an aunt. (Id. at 436.) She had a lot of mood swings, which Dr. Diffine attributed to her legal situation. (Id.) She would be incarcerated if she was found guilty of the charges relating to the shooting. (Id.) Dr. Diffine planned to get her diagnosis from Dr. Lorenzo, who Plaintiff had not seen in four to five years, before prescribing any medication. (Id.)

Three days later, Plaintiff went to the emergency room at Twin Rivers for neck pain and severe left knee pain. (Id. at 421-22.) She reported that Percocet caused her dizziness and nausea. (Id. at 421.)

On January 16, 2006, Plaintiff informed Dr. Diffine that she had trouble remembering things. (Id. at 440.) On examination, she was able, however, to remember things and Dr.

Diffine saw no evidence of memory loss.  (Id.)  She did not appear to be depressed or anxious.  (Id.)  Her major depression was characterized as in partial remission.  (Id.)  She was to return in one month.  (Id.)

The ALJ also had before him a Physical Residual Functional Capacity Assessment of Plaintiff completed by an agency counselor in July 2003.  (Id. at 240-48.)  The primary diagnosis was degenerative disc disease of the cervical spine; the secondary diagnosis was carpal tunnel syndrome.  (Id. at 240.)  Citing Plaintiff's medical records to date, the counselor concluded that these impairments resulted in a capacity to occasionally lift twenty pounds; frequently lift ten pounds; stand, walk, or sit for six hours in an eight-hour work; and an unlimited ability to push or pull.  (Id. at 241.)  She had no postural, manipulative, communicative, visual, or environmental limitations.  (Id. at 243-45.)  M. Holsclaw, M.D., reviewed and agreed with this assessment.  (Id. at 253-54.)

## The ALJ's Decision

After summarizing in detail Plaintiff's medical records, the ALJ determined that she had impairments of morbid obesity; mild osteoarthritis of the lumbar spine; mild chondromalacia and genu valgus (knock-kneed) of both patellas; a history of cervical spine disc bulges, spondylosis, and stenosis with discectomy and fusion; bilateral carpal tunnel syndrome with right carpal tunnel release; and depression.  (Id. at 21-29.)  She did not have, however, an impairment or combination thereof that met or equaled, in duration or severity, a Listing-level impairment.  (Id. at 29.)

The question then was how these impairments affected Plaintiff's residual functional capacity ("RFC"). In evaluating her RFC, the ALJ first assessed her credibility. After summarizing her testimony and the description on various forms of her activities of daily living, he concluded that the objective medical evidence did not support her complaints about her neck pain, low back pain, shoulder pain, knee pain, headaches, and carpal tunnel syndrome. (Id. at 29-30.) Specifically, the evidence did not support any abnormalities in her cervical spine, left shoulder, or knees for a continuous twelve-month period and did not support any abnormalities due to carpal tunnel syndrome or headaches for a period of that duration. (Id. at 30-33.) There were no physician-imposed limitations, but there were inconsistencies in the record between Plaintiff's testimony and her statements to various health care providers. (Id. at 33.) Nor was there any indication that Plaintiff had been fired from any work activity due to impairment-related limitations. (Id. at 34.) And, although Plaintiff described severely restricted activities, there was nothing in the record to indicate the existence of any muscle atrophy or loss in muscle strength that would result from such a lifestyle. (Id.) Also detracting from Plaintiff's credibility was her poor earnings record. (Id.) The ALJ noted that an award of benefits would result in more annual income than Plaintiff had in earned in all the years reported. (Id.)

The ALJ determined that Plaintiff had the RFC to occasionally lift ten pounds, to sit for the majority of the workday with some walking or standing, and to perform repetitive hand-finger actions. (Id. at 35.) This RFC prevented her from performing her past relevant work, but, considering her age and limited education, did not prevent her from performing

a full range of sedentary work.[11] (Id.) Applying the Medical-Vocational Guidelines (the "Grid"), the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Id.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alterations added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments

---

[11]Sedentary work requires lifting no more than ten pounds at a time and occasional walking and standing. 20 C.F.R. § 404.1567(a).

which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."  **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step in the process, the ALJ "review[s] [claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added).  "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments."  **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added).  "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"  **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).  Moreover, "[RFC] is a determination

based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the

inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant. See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. See also 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by referring to the medical-vocational guidelines (the "Grid") or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219. The Grid may not be relied on if the claimant suffers from non-exertional impairments unless those impairments "do not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities[.]" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (alterations added; interim quotations omitted).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a

preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ (a) improperly relied on the Grid and (b) improperly assessed her credibility. The Commissioner disagrees.

In support of her first claim of error, Plaintiff argues that she suffers from non-exertional impairments, i.e., pain, depression, and morbid obesity, that preclude the use of the Grid and she has impairments that prevent her from performing the full range of sedentary work, i.e., bilateral carpal tunnel syndrome.

As noted above, the Commissioner may not rely on the Grid at step five if a claimant is limited by a nonexertional impairment.  See **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006); **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).  Nonexertional limitations "affect an individual's ability to meet the nonstrength demands of jobs," Social Security Ruling 96-4p, 1996 WL 374187, *1 (1996), "that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling," 20 C.F.R. § 404.1569a(a).  "Nonexertional impairments that 'do[ ] not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities' do not prevent the use of the grids, however." **Ellis**, 392 F.3d at 997 (quoting Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 2005)) (alteration in original).  "'[W]here the evidence of exertional limitations is extremely limited, and the dispute focuses on whether the claimant has the emotional capacity to engage in sustained employment, resort to the grid is inappropriate.'" **Foreman v. Callahan**, 122 F.3d 24, 26 (8th Cir. 1997) (quoting Tennant v. Schweiker, 682 F.2d 707, 709-10 (8th Cir. 1982)) (alteration added).  As also noted above, the burden shifts at step five to the Commissioner.  **Pearsall**, 274 F.3d at 1219.

Pain, depression, and obesity are nonexertional impairments.  **Baker**, 457 F3d at 894; **Beckley v. Apfel**, 152 F.3d 1056, 1060 (8th Cir. 1998); **Lucy v. Chater**, 113 F.3d 905, 909 (8th Cir. 1997).  In order for Plaintiff's pain to diminish or limit her RFC to the degree necessary to preclude use of the Grid, her complaints about that pain would have to be found credible.  For the reasons discussed below, the ALJ did not err in finding them lacking in credibility.

There was no evidence, including from Plaintiff, that her obesity diminished or limited her RFC. The evidence of her depression was that she complained to Ms. Haggard about it in April 2005, more than thirty months after her alleged disability onset date, and that she complained to a family nurse practitioner and to Dr. Diffine about depression in the fall of 2005. On her reported last visit to Dr. Diffine she did not appear depressed or anxious. And, although she complained of memory loss, he found no evidence of such. This visit was within three months of her first complaint to him of depression. Her complaints were followed by requests for medication. On her fourth visit, she was accompanied by police. Dr. Diffine opined that her depression was situational. There was substantial evidence to support the ALJ's conclusion that Plaintiff's depression was not a significant nonexertional impairment. See, e.g., **Tindell v. Barnhart**, 444 F.3d 1002, 1007 (8th Cir. 2006) (affirming ALJ's finding that as to severity of claimant's depression; depression appeared to be situational and claimant had "little" history of medication for depression or anxiety).

There is also substantial evidence to support the ALJ's conclusion that Plaintiff had the RFC to perform repetitive hand-finger actions. After Plaintiff underwent carpal tunnel release surgery, her complaints of wrist pain were sporadic, she did not return to the surgeon who performed that surgery after complaining to Dr. Granada of wrist pain; and she did not have the surgery on her left wrist. Other than Plaintiff's own testimony, found not to be credible as discussed below, there was no evidence that her wrist pain limited her RFC to a greater degree than found by the ALJ.

In support of her second claim of error, Plaintiff specifically argues that the objective medical evidence supports her testimony, that the ALJ's conclusion that her credibility was undermined by the absence of muscle atrophy or the loss of muscle strength is an improper medical conclusion on the ALJ's part, that the absence of any physician-imposed limitations is not relevant given the lack of any solicitation of a doctor's opinion on the matter, and that her poor work history is reflective of the severity of her impairments.

"Where adequately explained and supported, credibility findings are for the ALJ to make." **Ellis**, 392 F.3d at 996 (quoting Lowe, 226 F.3d at 972).

The ALJ began his credibility determination with a detailed discussion of the medical evidence. "Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.'" **Gonzales v. Barnhart**, 465 F.3d 890, 895 (8th Cir. 2006) (quoting Ramirez, 292 F.3d at 581) (alterations in original). Accord **Baker**, 457 F.3d at 892-93; **Strongson**, 361 F.3d at 1072. This lack of objective medical evidence includes the absence of any permanent restrictions placed on Plaintiff by any of her physicians.[12]  See **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005) (affirming

_____

[12]Plaintiff argues that the ALJ failed in his duty to fully and fairly develop the record by not soliciting such opinions by her physicians.  The duty to fully and fairly develop the record exists, "even when, as in this case, the claimant is represented by counsel." **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000).  This duty requires that the ALJ neutrally develop the facts, **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004), recontacting medical sources and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004).  If, however, a

adverse credibility determination by ALJ who emphasized absence of any doctor's opinion that claimant was disabled); **Brown**, 390 F.3d at 541 (affirming negative credibility decision by ALJ who noted, inter alia, that claimant's doctor had released her to work with no restrictions after one month); **Tucker v. Barnhart**, 363 F.3d 781, 783 (8th Cir. 2004) (finding that ALJ properly questioned credibility determination of claimant whose medical records showed relatively minor degenerative changes and whose physicians did not place any restrictions on him despite allegations of severe pain).

Also relevant, but not dispositive, was the consideration that Plaintiff's prospective disability benefits would surpass all her earnings. See **Ramirez**, 292 F.3d at 581. See also **Frederickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004) (a claimant's poor work history is relevant when assessing her credibility; **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) (same); **Siemers v. Shalala**, 47 F.3d 299, 301 (8th Cir. 1995) (same). Her lack of earnings and employment preceded her alleged disability onset date, which is also the date she listed as the date when her impairments first bothered her.

And, regardless of whether Plaintiff's daily activities could be construed as supporting Plaintiff's claims, "[t]he ALJ [is] not obligated to accept all of [Plaintiff's] assertions concerning those limitations." **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996)

---

crucial issue is not undeveloped, the ALJ is not required to seek additional evidence. See **Goff**, 421 F.3d at 791. There is a difference between a record not being developed and the record simply not including the desired evidence. When Plaintiff was being treated by her various physicians, they did not place any restrictions on her. The ALJ properly considered this lack as detracting from her credibility.

(alterations added). See also **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (affirming ALJ's negative assessment of claimant's credibility; claimant's "self-reported limitations" on daily activities were inconsistent with medical record).

The ALJ also properly considered inconsistencies in the record as detracting from Plaintiff's credibility. For instance, she would complain to one physician about right wrist pain, but would not follow that physician's instructions to consult the surgeon who had performed the carpal tunnel release. She periodically complained of neck pain, but was seldom restricted in her range of motion in her neck. She reported improvement in her neck pain following a few physical therapy sessions, but stopped going to therapy and later told a health care provider that the therapy made her neck worse. She requested a knee brace, but on examination her knee was only slightly swollen. She reported memory loss, but had none on examination. She reported chronic back pain, but usually walked with a normal gait. She complained of chronic left shoulder pain, but failed to consistently seek treatment for such. Cf. **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005) (deferring to ALJ's credibility determination in case in which claimant gave inconsistent information to physicians and other health care providers); **Holmstrom v. Massanari**, 270 F.3d 715, 721-22 (8th Cir. 2001) (affirming adverse credibility determination based on inconsistencies between what claimant told doctor and hearing testimony).

"[W]hen a claimant's subjective complaints of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ, the [Commissioner's] burden [at the fifth step] may be met by use of the [Medical-Vocational Guidelines]." **Baker**, 457 F.3d at 894-

95 (quoting <u>Naber v. Shalala</u>, 22 F.3d 186, 189-90 (8th Cir. 1994)) (first two alterations added). Plaintiff's credibility was discredited by the ALJ for articulate, legally sufficient reasons. Therefore, the ALJ did not err in not relying on the Grid and did not err in concluding Plaintiff was not disabled within the meaning of the Act.

**Conclusion**

The question is not how this Court would decide whether Plaintiff is disabled within the meaning of the Act, but is whether the ALJ's decision that she is not is supported by substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision. For the reasons discussed above, there is such evidence. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this 25th day of September, 2007.